Good morning. Yes, Ms. Hong. May it please the Court, my name is Kari Hong. I am from the Florence Project. I'm pro bono counsel for Petitioner Aleem Urmancheev. I will reserve two minutes for rebuttal and I'll watch my time. I will discuss aggravated felony and then CAT. Starting with the aggravated felony, there is an intra-circuit conflict. And whether the 2016 matter of a bar decision will retroactively apply to Mr. Urmancheev's 2014 plea agreement. Miguel Miguel would apply Montgomery Ward to this situation because relying on Chevron, a change in law, includes matters of first impression. Elivas Mata announced it would not apply at Montgomery Ward unless a change in law involved an actual reversal of precedent. These decisions are in conflict with each other. Under Antonio v. Wardscope Packing, this panel cannot pick between these decisions. It cannot follow the first in time. It cannot follow the correct reading. Rather, this panel is compelled to call for en banc review and the full court is compelled to hear it. On CAT. It's rare to have somebody say that the court must hear a case en banc. Yes, Your Honor, I do not mean to have the hubris. May we quote you? Well, you can quote Antonio Wards Packing Company that does use that language. And it says unless the court can reason, can have a distinguishable situation, the court has to follow it in absence or in situations. Antonio says that the full court must hear it as well. So in your view, our case law is inconsistent on whether or not the application of the categorical approach constitutes a change in law. Is that your position? Yes. And Judge Watford's dissent makes note. And he, I think, I agree with his reading where he says that Mr. Elivas Mata was in the exact same situation as Mr. Miguel Miguel. And his dissent does an excellent job of explaining why. So on CAT. And then the Cheneaux case that I filed in the Rule 28J letter, though, also provides authority for this court to bifurcate the aggravated felony en banc call from the CAT issue. Because this court has the authority to decide CAT on its own to either grant it or deny it. So on the CAT. Let me just one other question. Let's just say even if we ask the court to take it en banc, say the court says we're not doing it, then what do we do? Well, that's it. And the client loses? If the court doesn't take it, that means it doesn't see there's a conflict, and then this court would then decide. So if we take the position that applying the categorical exemption does not constitute a change in the law, then your client loses on that point. Is that correct? Well, the question is, does a change of law include a reversal of precedent, or does a change of law include matters of first impression? That's the conflict between Miguel Miguel and Elivas Mata. And the opening brief provided the framework that if you agree under Miguel Miguel that matters of first impression can be retroactively applied, that was the framework that would be relevant at that time. Now, turning to CAT, there are two ways by which this court can resolve CAT. And the first way is for the court to recognize that when a totalitarian government criminalizes, arrests, and imprisons people for practicing a disfavored religion, that state action amounts to torture. Are you alleging that that happened to your client? No. I didn't think so, because it's a country condition kind of thing. But what I understood your claim was is that when he went to a mental institution, he was poorly treated, but one can say that's just the way mentally ill people are treated in certain countries. But to just claim that, I think in this case, Seventh Day Adventists, if I recall correctly, that they are being mistreated and your client gets to take advantage of that even though that never happened to him, is that your argument? Bromfield says that is the argument, and Jehovah's Witness is his witness. The I.J. found Mr. Urban Chief credible. He found his conversion credible. And the I.J. himself pointed to the 2017 law that bans, criminalizes, and arrests. And let's take that as all being true. He never was persecuted because he was a Jehovah's Witness in Russia. Your Honor, absolutely. And that's what happened in Bromfield where a gay man from Jamaica was in the United States. He was closeted when he lived in Jamaica. He came to the United States. He came out of the closet. And there was the exact same situation where the country conditions in Jamaica said that the Jamaican government was criminalizing, arresting, and imprisoning gay men. And there, Bromfield said, look, when a government criminalizes and imprisons someone for a protected status, that action is going to be torture. And what's notable there in Bromfield. Even though it didn't occur to the petitioner him or herself, right? Yes, and Bromfield at 1079 has a citation there that they use the term all gay men are at risk when a state criminalizes and imprisons someone for their status, and that would be the same situation for Mr. Urban Chief. But we don't have a gay person here. This is a matter of religion, right? Yes, but the analogy is very much the same. And in this way, there is a second way to resolve the religion, is that the IJ overlooked that in 2017 when Russia passed this law, 5,000 to 10,000 Jehovah's Witnesses fled the country. Now, CAT defines torture to include mental suffering, coercion, and intimidation. In Edu V. Holder, they're recognized that the very suppression of political beliefs is a form of torture. Of course, there are a lot of people who've converted, I suppose, in Russia who've never been persecuted or prosecuted or put in jail, right? Yes, but what Edu V. Holder says that if you condition someone's safety on denying who they are and suppressing their active activity, which there was their political opinion, here it would be if you suppress. The only way if he can be safe is if he stops practicing his religion or if he hides his religion. That is torture under the regulations and under the logic and reasoning of Edu. But it's all perspective and speculative. That's what I struggle with. The argument that you're making based on Brumfield would open the whole world to anybody that says, I'm a sincere whatever. And in that country, a lot of these people have been tortured for practicing that religion or whatever it happens to be. You can take it over to political belief, whatever you want to if it's a protected category. If you don't have to show that you've suffered it, we would have thousands more cat claims that we would have to grant. Would we not? Well, it's not for the whole world. It's only in the countries. Oh, I understand. Well, there's lots of totalitarian countries. It's the totalitarian countries that have criminalized the status. And Brumfield actually has a really nice discussion of this concern where Judge Fletcher talks about the difference between random violence and targeted violence. This one obviously does for Russia, but Belarus, China, North Korea, any of those same kind of thing. As you know, we had all kinds of felon gong cases for a long time. If you're right, all those felon gong cases should have led to a successful cat claim, right? Well, under Brumfield, they would. And does Brumfield control this issue? Brumfield is on point to this situation where it's the same situation where they came to the United States. They came out to their identity, and then the country has banned the person of their religion. The gay issue I think is personally a little different than what we're talking about here because somebody either is or they're not gay, whereas a religion is a choice, arguably. So I'm struggling with how we get to where you're talking about it. This seems so speculative, so fraught with, if you will, slippery slope and thousands and thousands of cases that come through the system. Well, Your Honor, if I could pivot to the second pathway. Hopefully that's more persuasive to you. The second pathway to resolve cat is to build on Velezquez-Semillo's observation about how a fact finder is supposed to go about in looking at aggravated risk. And the IJ here shows about how he did it wrong in two very critical ways. In the first way, I mean, what the regulations and what Velezquez-Semillo has said that cat is supposed to look at all aggravated risks, which in this case is religion and political opposition and mental status. And it has to look at them together. What the IJ here did is it put each three in isolation and looked at whether three hypothetical people who only had one risk, only had religion, only had political opposition, or only had mental status, would they reach this 51% standard? And, of course, under that analysis, they didn't. The question has to be, what is going to happen to Mr. Irvinchief? Because cat contemplates an indivisible and an intersectionality approach to risk, which means often the whole is greater than the sum of its parts. Now, Mr. Irvinchief was forced into a psychiatric hospital at age 17. In 1990, he was twice arrested for his political opinions. He was beaten twice by the Soviet police. In 2013, he went back. He attended two political protests. He is part of a banned religion. Russia uses physical abuse and punitive psychological incarceration against political dissidents and those who practice the disfavored religions. So there is no doubt that Mr. Irvinchief, with all of those factors, will very much be in harm's way. The only uncertainty is which factor will come to the attention of the Russian authorities first. Didn't he go back, though, one or two times, engaged in all these things and never had any problem? Well, he went back once in 2013 when his father was dying. And when he was there, as the IJ found him credible, he is someone who doesn't sit quietly. He went out and found two political protests, and he attended both. There is surveillance, which the IJ noted in his finding that the Russian authorities have surveillance over the Internet. And as soon as he posted his photographs when he was safely in the United States, there were comments directed at him from his international entity. But he was never bothered? They didn't trouble him on that occasion? No, but again, with the aggregate risk, it shows that he's someone who's out in the open, and he will attend a political rally, which puts him in harm's way. I'm not sure I understood. Was he arrested on that occasion when he went back? No, no. He returned safely to the United States. Was he proselyting as a Jehovah's Witness at that time? He wasn't a Jehovah's Witness at that time. That was later. He came to the U.S., became a Jehovah's Witness. Correct. And then also in 2017, four years after that rally, the Russian government banned the Jehovah's Witness religion. So that wasn't in effect. But the second way that the IJ erred is that it did not understand what the more likely than not standard means. Here, the IJ weaponized math to reduce and distill risk factors. Judge Posner has eloquently explained that the more likely than not standard is the same preponderance of the evidence standard that's used in civil courts. So that means there are two likely outcomes. If he goes back to Russia, will he be safe, or will he experience torture? Under preponderance evidence of the standard, if it's 50% and a feather that he's going to be tortured, then cat is warranted. And on this record, it's much greater than a feather that he will be in harm's way. Do you want to reserve? Yes, Your Honor. Thank you. Mr. Oliveira? May it please the Court, my name is Andrew Oliveira on behalf of the Respondent, the Attorney General. Turning first to the aggravated felony question, Olivas-Matas controls the retroactivity question, specifically that case-by-case adjudication does not trigger retroactivity concerns. The apparent conflict between Olivas-Matas and Miguel Miguel is simply not there. Miguel Miguel is quite distinguishable from Olivas-Matas, and there is no reason for this Court to take the issue up en banc. Specifically, in Miguel Miguel, the issue was subsequent to the Attorney General's decision in matter of YL, which changed the standards necessary for determining whether a drug conviction constituted a particularly serious crime. As this Court noted in Miguel Miguel, at the time Miguel Miguel was convicted, the standards was matter of frentescu. The Attorney General subsequently issued a decision that limited or made the determination for particularly serious crimes for drug trafficking much harder to disprove. So, in that, in Miguel Miguel, there clearly was a change in the law. Here, there was no change in the law, because it was simply case-by-case adjudication. That is what this Court held in Olivas-Matas, that's what this Court held in Ortega-Lopez, and I would simply note that in both those cases, there was petition for rehearing en banc, which was denied in both cases. So, there is no apparent conflict between the cases. So, the government believes that this Court can simply uphold the immigration judge's determination that he is removable for having committed an aggravated felony. With that issue, I'll turn to the Convention Against Torture claim. The immigration judge correctly adjudicated the Convention Against Torture claim. The immigration judge correctly cited the aggregation standards. The immigration judge then did analyze each claim individually, but then at the end, taking both the country conditions and the specifics of each claim in aggregate, the immigration judge concluded that petitioner failed to meet the more likely than not standard necessary for Convention Against Torture relief. I do want to briefly address the Bromfield case. Specifically, in that case, this Court did not hold that the criminalization of homosexuality is torture. The Court remanded for the Board to reconsider its decision on that, but it did not explicitly hold that the criminalization is per se torture. It is a relevant factor when it comes to acquiescence and, obviously, state action, but it is not per se torture. Which is why, as Judge Smith pointed out, in China there are a number of banned the Falun Gong house churches, and this Court has never held that those criminalizations are per se torture. Well, has the Russian government outlawed Jehovah's Witnesses in the whole country? It was a Supreme Court decision. The Russian Supreme Court ruled that it was an outlawed group. And so there have been some arrests, and the immigration judge noted that. The immigration judge considered whether Petitioner himself had a specific, what his risk of torture was. The immigration judge noted that while there were arrests, the population in Russia was estimated to be about 150,000 Jehovah's Witnesses, and there were 313 arrests in one year. And given the limited number of arrests, the immigration judge concluded that the likelihood of arrest alone was slight. Well, has the Petitioner here ever practiced Jehovah's Witnesses religion in Russia at all? No, he has not, Your Honor. He converted to Jehovah's Witness while he was in prison, and he has not been to Russia since he was convicted in 2014. But he did go to Russia in 2013, where he did participate in two opposition rallies. One, he estimated there was about 2,000 people in attendance. The second, there was approximately 10,000 to 20,000 people in attendance. That was his testimony. He testified that when he was at the rally, he was trying to take photographs, and the police simply told him to stop taking photographs. He complied, and he suffered no further interaction with the police, let alone harm or torture. So those two grounds, there isn't evidence of past torture. But as to his ground of mental illness, there is such evidence. And there's also evidence in the record that he continues to suffer mental illness, which he's treating with drugs here, question mark, whether he'll be able to do that in Russia. So why isn't it more likely than not that he would be subject to torture on that ground? First, Your Honor, the immigration judge found that the psychiatric treatment that he had in the Soviet Union in the late 80s and early 1990s did not rise to the level of torture, because the immigration judge found that while the treatment was painful and abhorrent, it wasn't done with a specific intent to torture. The record reflected that the Soviet doctors were attempting to treat his schizophrenia. And it is uncontested that he does have schizophrenia. They weren't just injecting him with drugs for the purpose of harming him. Furthermore, there's nothing in the record to suggest that he would not be able to receive medication for his schizophrenia. The immigration judge noted that the petitioner testified that his mother also suffers from schizophrenia, and there's no suggestion that she is unable to treat her condition, nor has she suffered any harm for her mental illness. So to your question, Your Honor, there's simply nothing in the record that suggests that he cannot continue treating his schizophrenia in Russia. If there are no further questions, the government asks that you affirm the decision of the immigration judge and the board and deny the petition for review. All right. Thank you, counsel. Thank you. I have three points. First, on the psychiatric treatment, the IJ said there was no past torture because the Soviets were underfunded and that sulfazinium is not used. There's nothing in the record to show that the Soviet Union of the 1980s was underfunded. And also, as cited in the reply brief, the Russians today still use sulfazinium against political dissidents, against religious minorities, and against psychiatric patients, including children. And those citations are at 365, 403, and 405. These are politically active children I trust. No, no, no. But those actually, those were children with disabilities, which is how he was targeted in the 1980s. And the documents show that the Russians still treat people with disabilities in that manner. Let's say that's correct. The reality is, I think the literature in this case shows the same thing, that certainly at that point, Russian mental health treatment was in a very different world for everybody, not just dissidents, and that almost anybody that went into mental health situations there were, by our standards, really, really poorly treated. Is there evidence that your client was treated differently because he had political dissidents at this point? Your Honor, what the IJ here did is took the reasoning of JRGP, which involved the underfunded Mexican facility, and they just grafted that finding onto Russia and the Soviet Union, which is not contained in this record. The fact that 403, 405, the concern isn't that he's schizophrenic and he'll be erratic and he'll be arrested, which is what often happens in the Latin American cases. What happens is that Russia has decided to weaponize psychiatric care. It's called punitive psychiatric incarceration throughout the country conditions where they use that mistreatment to harm. But there's no evidence, is there, that that's what happened to your client? Well, it is in terms in that he – I know he had treatment, but is there any evidence that said it was done punitively because he was a dissident? Well, it was because he was disabled, because they insulted him for being disabled. They did not try to treat him. Again, I respect that, but they didn't do it because he was a dissident. No. No. And the second point, though, on Bromfield at 1079, the record here compels the conclusion that the Jamaican government not only acquiesces in the torture of gay men, but is directly involved in such torture. So contrary to my brother's contention that Bromfield hadn't reached that issue, it very much did. Third point, also in Bromfield at 1079, my brother said that, you know, there is no risk. But again, Bromfield says, in light of a statute criminalizing homosexual conduct and the widespread targeted violence against homosexuals, all gay men are at risk. So would respect – would contend that that applies to religion in Russia. Thank you very much, Counsel. And thank you for taking this case pro bono. Thank you.
judges: Siler, WARDLAW, SMITH